UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

TREVOR SHAPIRO and
JOHANNA QVIST,                                                    Civ. No.

              Plaintiffs,

                                  **VERIFIED COMPLAINT**

      -against-                                        Jury Trial Demanded

TRUDY JACOBSON and STEPHEN KOMOREK,

              Defendants.

—————————————————————————— x

      Plaintiffs TREVOR SHAPIRO and JOHANNA QVIST, by and through their

undersigned counsel, bring this Verified Complaint against the above-named Defendants as

follows:

## NATURE OF THE ACTION

      1.     Plaintiffs bring this civil RICO action against the above-named Defendants,

seeking money damages for having used the money and resources of their racketeering

enterprise, which included companies owned and controlled by the Defendants – including non-

defendants Trans Am Trucking Inc., Jacobson Holdings, Inc, Jacobson and Press Talent

Management, and API International Consulting Group, Inc. ("API") – to engage in a

racketeering campaign and conspiracy to harass, damage and defame Plaintiffs through a

malicious campaign financed by Defendant Trudy Jacobson with money that she siphoned off

from her family businesses, *i.e.,* Trans Am Trucking, Jacobson Holdings, Inc. and Jacobson and

Press Talent Management, and in excess of $1.8 million. This action also seeks damages for

tortious interference with business relations, intentional infliction of emotional distress, and

negligent infliction of emotional distress.

**THE PARTIES**

2.      Plaintiff TREVOR SHAPIRO is a model and businessman residing in New York County.

3.      Plaintiff JOHANNA QVIST, who resides in Manhattan, is a registered nurse and girlfriend of Plaintiff Shapiro.

4.      Defendant TRUDY JACOBSON ("Jacobson"), a businesswoman and former girlfriend of Plaintiff Trevor Shapiro, is a resident of Kansas. Defendant Jacobson and her husband, Johnny Jacobson, founded TransAm Trucking Inc. ("TransAm"), a trucking company in the Midwest in 1987.  TransAm has grown to a fleet of 3,600 trucks with an annual revenue of nearly $250 million. Jacobson is also chair of the board of Jacobson Holdings, Inc. ("Jacobson Holdings"), headquartered in Olathe, Kansas, with facilities also in Texas and Florida, involving transportation, logistics, equipment leasing, and financial services. In approximately 2018, Defendant Jacobson moved to New York, paying $11.5 million to buy a 3,000-square-foot apartment in the Plaza Hotel overlooking Central Park. She then had a romantic relationship with Plaintiff Shapiro, which ended in approximately December 2020. Thereafter, Defendant Jacobson used – and continues to use – the money and resources of TransAm and Jacobson Holdings, as well as that of other business entities owned and controlled by Jacobson, to engage in a racketeering campaign against plaintiff, as part of an association-in-fact Enterprise involving Defendant Stephen Komorek**,** his company (API), as well as non-parties Conflict International Inc. ("Conflict International"), Jason Cohen, Michael Tapling, Pat Welsh, Juan Leonbravo, Bryon Augusto, and Axelle Wa Ngongo. Jacobson also formed a talent management agency in or about June of 2022, and filed a trademark on June 8, 2022 under the name "Jacobson and Press Talent Management" ("JPTM") in order to harass plaintiff Johanna Qvist, who works at Albany Medical

2

Center, and to harass non-party Victoria Pressley a/k/a Vicky Press, an associate of Plaintiff Trevor

Shapiro, and Ms. Pressley's daughter, who works at a business virtually next-door to JPTM's

offices.

5.       Defendant STEPHEN KOMOREK ("Komorek"), a resident of Ohio, was, during

a portion of the relevant time period, senior vice president of Conflict International Inc., a New

York-based investigative agency. He then became the CEO of API, based in Columbus, Ohio.

Defendant Komorek and his company, API, participated in numerous aspects of Defendants'

racketeering enterprise and conspiracy by, among other things, preparing a letter/affidavit and

"Due Diligence Request," purportedly on behalf of Conflict International, dated June 13, 2021,

which falsely represented that he had conducted a full due diligence investigation of the "facts"

set forth in various false and defamatory articles published by Law Enforcement Today ("LET")

about Plaintiffs and others.

## JURISDICTION & VENUE

6.       This Court has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, over the

claims in this lawsuit.

7.       This Court has personal jurisdiction over Defendants because they conduct a

substantial amount of their business within the District, and most of the acts complained of

giving rise to the matter in controversy occurred within this District.

8.       This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C.  §

1332  in that the matter in controversy exceeds the sum or value of $75,000, and the parties are

citizens of different states.

9.       This Court has supplemental jurisdiction to hear and decide relevant causes of

action arising under the laws of the State of New York.

10.     Venue is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a), as **Defendants'** actions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

11.     From approximately 2018 until December 2020, while Defendant Trudy Jacobson resided in an apartment at One Central Park South in Manhattan, Plaintiff Shapiro and Defendant Jacobson had a romantic relationship.

12.     After they broke off their relationship in approximately December 2020, Defendant Jacobson launched a campaign to harass, damage and defame her former lover, Plaintiff Shapiro, by hiring her co-Defendant and others to carry out her malicious campaign.

13.     In the complaint that she filed in federal district court in New York on November 30, 2022 against Conflict International Inc. and others (*Jacobson v. Conflict International Inc., USDC, S.D.N.Y., Docket No 22 cv 10177*), Defendant Jacobson admits that on or about March 2, 2021, while in New York, she hired Conflict International to perform certain private investigative services (the "PI Contract"). Jacobson Complaint, at ¶ 18. According to her Complaint, a third party had recommended that Jacobson consider working with "S.K." (later identified in the filings of the federal case as Stephen Komorek), "who was associated with Conflict International." *Id.* Jacobson also discloses in the federal complaint that "[p]ursuant to the PI Contract, Ms. Jacobson ultimately paid $1.8 million to Conflict International." *Id.*, at ¶ 21.

14.     Although the "target" of the investigation is not identified specifically by name, it is clear from the language of the Jacobson federal complaint that the "target" was Plaintiff Shapiro, since the federal complaint alleges (at ¶ 27) that the "target" made alleged defamatory and humiliating allegations to Jacobson's husband, a thinly veiled reference to the email dated

January 19, 2022 that Shapiro wrote to Jacobson's husband, which was filed by Conflict International's counsel in the Jacobson federal action as an exhibit.

15.    Shortly after Jacobson had hired Conflict International, during March 2021, Conflict International and its then Senior VP, Defendant Komorek, hired private investigator Jason Cohen to visit Shapiro at his Manhattan apartment and give him a folder that Cohen described as follows: "This is for you from the people in Italy." Upon information and belief, this was a veiled reference to the Italian Mafia that was intended to instill – and did instill – fear into Shapiro. Cohen was also making a video and audio recording of Shapiro. Defendant Jacobson provided the financing for this and every other aspect of the scheme and conspiracy in order to harass, damage and defame Plaintiff, including through the publication of false and defamatory articles in Law Enforcement Today.

16.    Literally moments after Cohen left the area of Shapiro's apartment, Jacobson texted Shapiro saying that a man came to her apartment and gave her a folder as well. When Shapiro looked inside the folder, there were photographs of a man (which Jacobson apparently misidentified as Shapiro) with other women. There was also a list of Shapiro's family members in the folder, which Shapiro took to be a physical threat. The folder also included Shapiro's personal information, such as his social security number.

17.    About two weeks later, near the end of March 2021, Defendant Jacobson mistakenly texted Shapiro (rather than Cohen or some other investigator following Shapiro) while he was out having dinner with friends. The text read: "His [Shapiro's] guy friend the one I sent photos of, is at a restaurant."

18.    When a female friend of Shapiro – who was among a group having dinner in New York – returned to her home in Florida, she and her husband were visited by two unidentified

men, who told her, "this is from the people in Italy," which were the exact words that Defendant

Cohen had used with Shapiro when he handed him the folder at his apartment building in

Manhattan. The folder contained photos of Shapiro's female friend and Shapiro having dinner at

the restaurant where Jacobson had inadvertently texted him. The photos were designed to

embarrass Shapiro's female friend in front of her husband, in the hopes that it would then

embarrass and humiliate Shapiro and interfere with his friendship with the woman.

19.     In or about May 31, 2021, Plaintiff Shapiro and some friends were out bowling in

Manhattan. After about one hour, a worker in the bowling alley approached Shapiro and dropped

a note for him to pick up. The note read: "Two men are taking photos of you from across the

bowling alley." When Shapiro approached the two men and asked them why they were taking

photos of him and his friends, they denied the allegation and quickly left.

20.     In early June 2021, Shapiro and his friend, Cheyenne Lutek, decided to create a

completely legal and legitimate online business named "Him-Eros." The site was designed for

women to hire men as escorts and companions at social and charity events.  In order to log into

the site, one had to make a profile and sign up for free. Ms. Lutek was the operator, so she could

see who logged into the site. One particular woman kept logging in and repeatedly asking if there

were "any other guys working on the site as a companion." Plaintiff Shapiro eventually realized

that this woman who kept calling and asking questions was actually Defendant Jacobson using

an assumed name. Shapiro had an old voice recording of Jacobson, which was an identical voice

to the one that kept calling their business phone. The repeat phone calls from the "customer,"

asking if there were "other men" available, came from Kansas, where Jacobson and her husband

have a residence. When Ms. Lutek asked the caller whether her real name was "Trudy," the

caller abruptly hung up.

21.     On July 9, 2021, Plaintiff Shapiro learned that a photo and false and derogatory article about him had been posted on a website called "thedirty.com," which, upon information and belief, had been posted by Defendants and/or one of their unidentified agents who were aiding, abetting and conspiring with them.

22.     Shortly thereafter, a similar false and derogatory article about Plaintiff Shapiro posted, upon information and belief, by the Defendants and/or their agents, and financed by Defendant Jacobson, appeared on another website called "thewrongdoer.com," entitled, "Trevor Shapiro Or Should I Say Trevor Dutch Con Artist Gay Porn Star."[1]

23.     On June 19, 2021, LET published an article[2] containing numerous false and defamatory allegations relating to Plaintiff Shapiro, including the following portions, which falsely portrayed Shapiro as a male prostitute:

> *"However [Cheyenne] Lutek trying to portray her business as an "escort" service is laughable.*
> *One of her 'models' is a guy named Trevor Dutch Shapiro who goes by the name of Trevor Dutch.*
>
> \*\*\*
> *Over the course of several weeks of surveillance of Shapiro, he was observed with various females, staying at different hotels. Law enforcement sources tell us Shapiro is believed to be performing other services besides what is described on the Him Eros site. Police sources tell Law Enforcement Today that based on their experience on similar investigations and given the language on the website – combined with financial "incentives" – it appears Lutek is running a cover for a male prostitution operation or something at least incredibly similar. Kind of lends a whole new meaning to "pay for play."*

24.     Shortly after the publication of this article in LET, Defendant Jacobson bragged in text messages to Victoria Pressley a/k/a Vicky Press, a mutual acquaintance of both Jacobson

---

[1] https://thewrongdoer.com/trevor-shapiro-or-should-i-say-trevor-dutch-con-artist-gay-porn-star/amp/
[2] https://www.lawenforcementtoday.com/as-the-decriminalization-of-prostitution-spreads-america-is-facing-a-growing-moral-crisis/ *(available on the Wayback Machine https://archive.org/web/).*

and Shapiro, that the June 19, 2021 article published in LET – as well as other defamatory articles about Plaintiff Shapiro and Cheyenne Lutek – had been paid for by her (Jacobson).

25.     On July 4, 2021, Shapiro noticed that he and his co-Plaitiff, Johanna Qvist, were being followed by a man with a unique American flag tattoo on his forearm. The man followed them from Brooklyn to Manhattan, after Shapiro and Qvist had celebrated Independence Day. Again, in mid-July, Shapiro saw the investigator with the American Flag tattoo follow him and a few friends when they went to an arcade in midtown Manhattan. When they left, Shapiro saw the tattooed man with a female standing by a building down the street. As Shapiro and his friends walked past them, Shapiro commented on his tattoo, saying "hey, you look familiar" and started walking away. The two investigators continued to follow them. On a third occasion, which was on August 12, 2021, the same tattooed man followed Shapiro and his friend Brian, who had flown into town to visit his sister's memorial site (on Ludlow in lower Manhattan). After visiting the memorial site, Shapiro and Brian went to a bar around the corner from Ludlow Street, where the same man followed them. They then left the bar and went to a Marshalls store, where the man with the same tattoo followed them. Plaintiff approached the man and complimented him on his tattoo, adding that he knew a tattoo artist in the City who had several well-known clients, including "Trudy Jacobson." The man immediately broke off the conversation and hurriedly left the store.

26.     On July 27, 2021, another article generated by Defendants and/or their agents, and paid for by Defendant Jacobson, appeared on a site called "ripoffreport.com,"[3] which was purportedly about a photographer named Robert Evans, who allegedly wrote that he had hired

---

[3] https://www.ripoffreport.com/report/trevor-dutch-shapiro/new-york-city-scammed-male-1510433

Plaintiff Shapiro through his modeling agency to be photographed for his website (which was false since no one by that name had attempted to hire Shapiro for a photoshoot). In the article, the fictitious author ("Robert Evans") alleges that Shapiro showed up drunk, apparently on drugs, and that he became violent. It further alleged that Shapiro had stolen a watch and Chanel sunglasses, which was a false and defamatory allegation that signaled to Shapiro that the Article had been concocted by Jacobson, since she had gifted a Rolex watch and Chanel sunglasses to him on his birthday the year before. The article further stated that the alleged incident occurred at a studio on Ludlow Street in downtown Manhattan; however, based upon Plaintiffs' investigation and upon information and belief, there is no such studio owned or used by any photographer named Robert Evans. Upon information and belief, the fictitious "Robert Evans" was a pseudonym used by Jacobson, Komorek and/or one of their operatives and agents to write the two other defamatory articles which appeared on "ripoffreport.com" targeting Plaintiff's ex-business partner Cheyenne Lutek,[4] and Plaintiff Qvist.[5] A similar defamatory story was posted by Defendants on "scamsiti.com."[6] Thus, in one way or another, all of the defamatory articles posted online about Shapiro tie back to Defendant Jacobson.

27.    On July 30, 2021, Cheyenne Lutek received a phone call from an airline agent at Newark Airport, claiming that "her boyfriend was at the terminal waiting for her." Ms. Lutek informed the caller that her boyfriend could not have been at Newark Airport, since she knew that he was in Los Angeles. The agent notified the airport police of the impersonation, and the "boyfriend" was detained at the airport. This man was identified as Jason Cohen, who had

---

[4] https://www.ripoffreport.com/report/cheyenne-lutek-global/new-york-ny-trevor-dutch-llc-1511998
[5] https://www.ripoffreport.com/report/johanna-qvist-bild-jojjo/new-york-city-castro-nurse-1513705
[6] https://scamsiti.com/trevor-dutch-scammed-by-trevor-dutch-a-male-fashion-model-in-nyc-with-him-eros-emg-models-ny-hamptons-nj-ca/

pretended to have "lost" his phone and needed the assistance of the airport agent to call his "girlfriend."

28.     During August 2021, Plaintiff Shapiro noticed that whenever he was walking down the street in Manhattan where his apartment was located, there was a man in a car who would be videotaping him, and then driving off. He also noticed that he was being videotaped by a man while he was at a deli in his neighborhood.

29.     Upon information and belief, Jacobson, Komorek, and one or more of the agents and operatives they used to carry out their dirty work and campaign to destroy Plaintiffs' reputations and those of their close friends and associates, all of whom were acting on her behalf and being paid by her, were responsible for the innumerable "troll" Instagram accounts that appeared for the purpose of humiliating and harassing Plaintiffs. One such account, which appeared by the name "trevordutch.shapirorat," contained a depiction of a rat, implying that Shapiro himself was a "rat." Curiously, this exact photo also appeared on the personal Instagram of Trudy Jacobson, with the caption "remember him," directly tying Jacobson to the fake account. That same Instagram account also contained a link to one of Jacobson's paid-for LET articles defaming Shapiro. A similar account, by the name "cheyenne.lutek," appeared in the same style, claiming, "Cheyenne had massive plastic surgery to her breasts," and further linking to an article published by LET and paid for by Jacobson.

30.     During November 2021, the parents of Cheyenne Lutek received a package from an anonymous sender, including photographs of Ms. Lutek while she was on a trip to Spain with a friend during the summer of 2021, and an article about Ms. Lutek alleging that she was involved in sex trafficking appeared on the internet.

31.    The parents of Plaintiff Shapiro also received a similar package a few days later, and Plaintiff's brother living in New Hampshire also received the same package of false, derogatory and defamatory materials.

32.    On November 17, 2021, Plaintiff Qvist returned home to her apartment after working a night shift at the hospital. Someone had hung a 6-foot tall banner of posters right outside her apartment. The posters consisted of photographs of Shapiro and Cheyenne Lutek with bold letters reading "REPORT HUMAN TRAFFICKING," with a human trafficking hotline number. Qvist took down the posters and reported the incident to the police, but not before numerous curious bystanders, including tenants in her apartment building, had seen the posters.

33.    One month later, on December 17, 2021, Qvist was shocked to find that the same posters had been posted outside throughout her neighborhood on telephone poles. Someone had obviously mapped out her route from her apartment to the subway stop which she used to go to work. Although she took down the posters she saw, new ones would be posted the following day.

34.    On January 5, 2022, the same posters started appearing outside Plaintiff Shapiro's apartment in Manhattan.

35.    LET published a second article about Shapiro, dated  October 29, 2021,[7] which also falsely and maliciously stated that Plaintiff "is nothing more than a common criminal," that he showed up at a fictitious photo shoot "drunk or on drugs," that he became violent and stole a "Rolex, ... designer sunglasses, and cash," that he "is the equivalent of a gigolo," and is "under

---

[7] https://www.lawenforcementtoday.com/instagram-influencers-with-disturbing-backgrounds-may-be-harming-young-girls-using-social-media/ *(available on the Wayback Machine* https://archive.org/web/*)*.

.

investigation for sex trafficking and drugs." The relevant portion of this October 29, 2021 article

states as follows:

> *"One of Lutek's "models" was a guy named Trevor "Dutch" Shapiro, who went by the name of Trevor Dutch. As we reported, Shapiro was involved with a number of different women through Him Eros and it is believed he and Lutek were actually in business together.*
> *Some say, however, that Shapiro is nothing more than a common criminal. According to a site called "Ripoff Report," Shapiro was hired by a New York City photographer to act as a professional model for his website and social media to promote his business.*
> *He claimed that when Shapiro showed up, he was either "drunk or on drugs."*
> *Long story short, at some point Shapiro allegedly became violent, punched the photographer in the face and stole his Rolex, his designer sunglasses, and cash from his wallet. Shapiro is promoted on Instagram as Trevor Dutch.*
>
> ***
>
> *Shapiro meanwhile has over 23,000 followers.*
> *So what's the problem you may ask? Lutek is basically the equivalent of a porn actress. Shapiro is the equivalent of a gigolo.*
> *These are only two so-called "influencers" on Instagram. According to the reviewer on Ripoff Report, both Lutek and Shapiro are under investigation for sex trafficking and drugs. Our previous report was referenced on this page.*
>
> ***
>
> *In case you missed our original report, we have included it below for your reading pleasure* [and then going on to include the whole June 19 Article].

36.     On May 2, 2022, Defendants caused a third defamatory article to be published in

LET – paid for by Defendant Jacobson – under the pseudonym "Patrick Henry,"[8] alleging, in

part, as follows:

> *"As we reported in June, Lutek runs (or ran) a New York City- company called Him Eros. The link to the website appears to have been deactivated since we ran our story.*
>
> *That site, which was touted as a place where a woman (or man) can go to hire a "companion." In other words, law enforcement sources told us it was an escort service, code name for a prostitution site. Think high-end "Backpage."*
>
> *One of Lutek's "models" was a guy named Trevor "Dutch" Shapiro, who went by the name of Trevor Dutch. As we reported, Shapiro was involved with a number of different*

---

[8] https://www.lawenforcementtoday.com/not-all-swindlers-and-fraudsters-are-men-let-investigates/

*women through Him Eros and it is believed he and Lutek were actually in business together.*

*Some say, however, that Shapiro is nothing more than a common criminal. According to a site called "Ripoff Report,"[9] Shapiro was hired by a New York City photographer to act as a professional model for his website and social media to promote his business. He claimed that when Shapiro showed up, he was either "drunk or on drugs."*

*Long story short, at some point Shapiro allegedly became violent, punched the photographer in the face and stole his Rolex, his designer sunglasses, and cash from his wallet. Shapiro is promoted on Instagram as Trevor Dutch.*

*And what of Lutek, the Instagram influencer? The same website, Ripoff Report[10] has a post about Lutek, also from a photographer who hired her for a shoot to promote her on Instagram, and basically outed her as a phony.*

*Moreover, the reviewer called out Lutek's "status" as an Instagram influencer, however, notes she doesn't have one movie or television gig, while noting her "modeling" career consists of porn websites and the escort service Him Eros, noting her "business partner" Dutch Shapiro who also claims to be a "musician, model, magician" also has no jobs to be found other than porn websites and the escort service."*

37.     The statements in the LET articles regarding Shapiro are false in that, among

other things:

   • Shapiro was never a "working model" for Cheyenne Lutek's site "Him-Eros."

   • The articles misrepresent that there is surveillance footage of Shapiro with several women in other hotels on various occasion. There is no such surveillance footage since Shapiro was never with different women at different hotels as alleged.

   • Cheyenne Lutek never booked Shapiro or anyone else through Him-Eros, since the business was destroyed by Defendants before it could get off the ground.

   • If, as the articles falsely allege, Shapiro assaulted a photographer and stole his belongings, there would have been a police report, and undoubtedly the modeling agency that was used to secure Shapiro's services as a model would have been contacted. However, neither one of these actions were taken, thus confirming that the defamatory allegations were fictitious.

---

[9] https://www.ripoffreport.com/report/trevor-dutch-shapiro/new-york-city-scammed-male-1510433
[10] https://www.ripoffreport.com/report/cheyenne-lutek-global/new-york-ny-trevor-dutch-llc-1511998

38.     Defendants further targeted Plaintiff Qvist as a victim of their malicious scheme by causing to be published an outrageously false and defamatory post on "thedirty.com" on March 11, 2022, accusing her of being a "pornstar" with a fake nursing career.[11] The post, under the fictitious name of "Penny Shumaker," falsely and maliciously alleged that she paid $2000 to Qvist, who would be dressed as a nurse, to have sex with Plaintiff Shapiro in front of her. A similar post appeared on "ripoffreport.com."[12] However, in truth and in fact, Defendants well knew that Plaintiff Qvist had a legitimate and distinguished nursing career, had a Bachelor's and Master's degrees from Columbia University, and had no involvement with the "adult film industry."

39.     Plaintiffs suffered severe damages as a result of Defendants' malicious and defamatory campaign against them. Among other things, Plaintiff Shapiro's modeling career was damaged when fashion designers and others within the fashion industry cancelled actual and potential "photoshoots" with Shapiro either because they saw one or more of the false and defamatory publications disseminated by Defendants, or were spoken to directly by Defendants Jacobson or Komorek, or one of their agents or operatives, and given false and defamatory information about Shapiro. One such instance occurred when Defendant Jacobson spoke directly to Joseph DeAcetis, a fashion designer in New York, who was given false and defamatory "information" by Defendant Jacobson about Shapiro, including false information that Shapiro was having an illicit "affair" with Vicky Press, who ran a modeling agency known to Mr. DeAcetis.  In addition, the publication and circulation by the Defendants of derogatory and

---

[11] https://thedirty.com/new-york-city/penny-shumaker/#post-2643960
[12] https://www.ripoffreport.com/report/johanna-qvist-bild-jojjo/new-york-city-castro-nurse-1513705

defamatory stories about Plaintiff Shapiro, Cheyenne Lutek and the Him Eros company and website they were attempting to build forced them to shut down their business.

40.    Jacobson also managed to get Shapiro fired from a business where he worked, called "Cowboys4Angels", by falsely telling the owners of the business that Shapiro was also working at an "underground sex club".

41.    Plaintiff Shapiro suffered such severe psychological and emotional distress as a result of Defendants' actions that he required the assistance of a psychotherapist.

42.    On November 18, 2022, at approximately 08:34 am, a woman posing as Johanna Qvist phoned Bank of America, saying that she wanted to get some information about her bank accounts. Upon information and belief, the woman who was impersonating Plaintiff Qvist was Trudy Jacobson, or a woman hired by Jacobson and the other defendants. The woman had Qvist's passcode, social security number and other confidential identifying information required by the Bank representative before the information was given.

43.    Plaintiff Qvist has suffered severe emotional and psychological trauma as a result of this breach and disclosure of her confidential banking information and the rest of Defendants' campaign to destroy her reputation, livelihood and peace of mind.

## COUNT I
### (Violation of the Civil RICO Statute (18 U.S.C. § 1961 et seq.))

44.    Plaintiffs repeat and reallege the allegations set forth if the foregoing paragraphs of this Complaint as though fully set forth herein.

45.    Jacobson and Komorek (jointly referred to as "the RICO Defendants") are "persons" within the meaning of 18 U.S.C. § 1961(3).

**The RICO Enterprise**

46.     At all times relevant to this action, the RICO Defendants and various non-defendants – including companies TransAm, Jacobson Holdings, JPTM, API, Conflict International, The Silent Marketing, LLC, Cohen, Law Enforcement Today ("LET"), and individuals Kyle S. Reyes, Jason Cohen, Michael Tapling, Pat Welsh, Juan Leonbravo, Bryon Augusto, and Axelle Wa Ngongo, among others – constituted an association-in-fact enterprise (hereinafter "the Enterprise" or "the Racketeering Enterprise" within the meaning of 18 U.S.C. § 1961(4), and said enterprise engaged in activities which have an impact on interstate commerce.

47.     At all times relevant to this action, the RICO Defendants were associated with the Enterprise and, at the same time, were engaged in other activities which were separate and distinct from the Enterprise.

48.     In furtherance of the Enterprise, the RICO Defendants engaged in two or more acts of racketeering by making, *inter alia,* the following false, misleading and/or fraudulent statements:

• That Plaintiff Shapiro was a "Con Artist Gay Porn Star" (see ¶ 22 above);

• That Shapiro was a male prostitute running "a male prostitution operation" through the Him Eros website (see ¶ 23 above);

• That Shapiro was "a drunk," "used drugs," was "violent," and a thief (see ¶ 26 above);

• That Shapiro was "a rat" (see ¶ 29 above);

• That Plaintiffs engaged in "human sex trafficking" (see ¶ 32-34 above);

• That Plaintiff Shapiro was "nothing more than a common criminal;" that he showed up at a fictitious photo shoot "drunk or on drugs;" that he was "the equivalent of a gigolo," and that he was "under investigation for sex trafficking and drugs" (see ¶ 35);

• That Shapiro was a "working model" for Him-Eros (see ¶ 37);

• That Plaintiff Qvist was a "pornstar" with a fake nursing career, who was paid to have sex with Shapiro in front of a "client" (see ¶ 38);

• That Shapiro had an "affair" with Victoria Pressley a/k/a Vicky Press (see ¶ 37);

49.     The RICO Defendants were all part of the Racketeering Enterprise, within the meaning of 18 U.S.C. § 1961(4), which at all relative times possessed, and continues to possess, an ongoing organizational structure with sufficient continuity and which Enterprise related to – and relates to – the defamation campaign to destroy the reputations and livelihoods of the Plaintiffs ("the Campaign"), in which the various RICO Defendants all played a role in furtherance of Defendants' overall scheme to destroy the reputations and livelihoods of the Plaintiffs through false and misleading statements regarding them.

50.     At all relevant times, the Racketeering Enterprise's activities have affected and continue to affect interstate and foreign commerce and have existed separate and apart from the racketeering activity. For example, the lawful purpose of the Enterprise was to engage in the legitimate businesses, such as trucking and transportation (through TransAm and Jacobson Holdings), investigations (through API and Conflicts International), modeling management (through JPTM) and press/news articles (through LET).

51.     Defendants are "persons" under the civil RICO statute because they knowingly and willfully conducted and participated in the conduct of the Racketeering Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Defendants engaged in such unlawful conduct by using the Racketeering Enterprise to further their fraudulent scheme and campaign to destroy Plaintiffs' reputations and livelihoods.

52.     Similarly, as a further part of their scheme, the RICO Defendants also used the Racketeering Enterprise to conceal the fact that they were the masterminds behind the financing and planning of their heinous campaign to destroy the Plaintiffs.

53.     The RICO Defendants thus perverted the otherwise legitimate goals of the Racketeering Enterprise in order to associate with and conduct or participate, directly or indirectly, in the conduct of the Racketeering Enterprise's affairs through the pattern of racketeering activity alleged herein.

54.     Among other things, the Defendants systematically and fraudulently used the Racketeering Enterprise to disseminate false, fraudulent and misleading information about the Plaintiffs through the media, social media, emails, text messages and other electronic forms of communication.

55.     Furthermore, there is a substantial nexus between the Enterprise and the RICO Defendants' unlawful predicate acts in furtherance of their Racketeering Enterprise.

56.     As alleged herein throughout this Complaint, the RICO Defendants were well aware that their statements and representations concerning the Plaintiffs were false and untruthful.

57.     The RICO Defendants thus used the Enterprise as part of their scheme to defraud the public and to persuade Plaintiffs' business and personal contacts into believing their false statements. They further used the Enterprise to cover-up the falsity of their public misrepresentations concerning Plaintiffs.

58.     As part of their scheme to defraud, the RICO Defendants intended for the Enterprise to disseminate false, misleading, material misrepresentations through the mails and wires that falsified material information concerning the Plaintiffs. Similarly, Defendants used the mails and wires in dozens of communications with the Plaintiffs, associates, family members and friends of the Plaintiffs, and members of the public, and the use of the mails and the wires contained numerous material misrepresentations and omissions of material facts, all in

furtherance of their fraudulent scheme. These mail and wire communications included, but are not limited to, the following:

- The dissemination of fake instagram profiles (see
  https://www.dropbox.com/sh/gbui7rz03xed3s2/AAAaIK6nQo3gPwTusYDUz9x5a?dl=0)

- The mailing of (a) the LET articles to Plaintiff Shapiro's parents and brother, and Cheyenne Lutek's parents; (b) the "sex trafficking posters" falsely accusing plaintiffs of being involved in sex trafficking; (c) the "cease and desist" letter to plaintiff Shapiro accusing him of extorting defendant Jacobson; (d) the transmission via text messages from Jacobson to Shapiro confirming that she has a private investigator (PI) following him and; (e) the text message from Defendant Komorek to Jacobson about the fake articles about Shapiro that he had written. (see
  https://www.dropbox.com/sh/xu0clrofif82119/AAAc4CsTO2QqOzViMnnA6xr1a?dl=0)

- The transmission of numerous additional text messages from Jacobson and others. (see
  https://www.dropbox.com/sh/c3l55wzdn8afvke/AABk-decPwH-PTKiOM5a6ecea?dl=0)

- The use of websites that Defendants used to defame Plaintiffs and to harass them by defaming their close associates, such as Cheyenne Lutek and Vicky Press. (see
  https://fraudstersland.com/trevor-shapiro-or-should-i-say-trevor-dutch-gay-porn-star/;

  https://sexthirstier.com/i-was-scammed-played-and-abused-by-cheyenne-lutek-trevor-dutch-shapiro-and-johanna-qvist/;

  https://cheaters.news/trevor-dutch-shapiro/;

  https://www.ripoffreport.com/report/cheyenne-lutek-global/new-york-ny-trevor-dutch-llc-1511998;

  https://foulspeakers.com/176497/johanna-qvist-aka-johanna-bild-aka-jojjo-the-dirty/;

  https://www.ripoffreport.com/report/johanna-qvist-bild-jojjo/new-york-city-castro-nurse-1513705;

  https://www.lawenforcementtoday.com/global-experts-launch-new-enterprise-double-down-on-backing-the-blue/;

  https://www.adonismale.com/gallery/album/30585-trevor-shapiro/?letter=T;

  https://scamsiti.com/trevor-dutch-scammed-by-trevor-dutch-a-male-fashion-model-in-nyc-with-him-eros-emg-models-ny-hamptons-nj-ca/;

https://www.google.com/amp/thewrongdoer.com/trevor-shapiro-or-should-i-say-trevor-dutch-con-artist-gay-porn-star/amp/

https://www.lawenforcementtoday.com/as-the-decriminalization-of-prostitution-spreads-america-is-facing-a-growing-moral-crisis/;

https://thedirty.com/?s=Cheyenne%20lutek#post-2624105;

https://www.ripoffreport.com/report/trevor-dutch-shapiro/new-york-city-scammed-male-1510433;

https://www.ripoffreport.com/report/victoria-pressly/cherry-valley-new-york-talbot-1518213;

https://cheaters.news/trevor-shapiro-or-should-i-say-trevor-dutch-con-artist-gay-porn-star/;

https://thedirty.com/new-york-city/johanna-qvist/#post-2643960;

https://gossiparchive.com/local/i-was-scammed-played-and-abused-by-cheyenne-lutek-trevor-dutch-shap/;

Www.shameshots.org/trevordutchshapirof  )

59.     The RICO Defendants intended that these false and misleading communications be disseminated through use of the mails and the wires in furtherance of their scheme to destroy the Plaintiffs reputations, livelihoods and emotional/psychological well-being.

60.     The RICO Defendants and the Enterprise transmitted the false and misleading information contained in said communications to the Plaintiffs' friends, family members, business associates, and members of the public, causing Plaintiffs severe embarrassment, humiliation and both monetary and non-monetary damages to their business and professional reputations, directly caused by Defendants' fraudulent scheme and unlawful acts in violation of the civil RICO statute.

61.     The RICO Defendants actively concealed their defamation campaign against the

Plaintiffs by disguising their false and defamatory statements under the guise of "news" or

"investigative reporting," when in truth and in fact such articles and reports disseminated over

the wires were nothing more than "hit jobs" designed to damage and destroy the Plaintiffs.

**The RICO Predicate Acts**

62.     The RICO Defendants carried out their acts of racketeering by utilizing the mail,

interstate wires and electronic communications in furtherance of their racketeering scheme and

campaign by, *inter alia,* disseminating through media and social media outlets the false,

deceptive, misleading and defamatory misinformation about the Plaintiffs, and such conduct

constitutes racketeering activity by the RICO Defendants.

63.     The Defendants' repeated acts of racketeering, including the dissemination by text

messaging, emails, and social media platforms, constitute a pattern of unlawful conduct.

64.      For the purpose of devising and carrying out their scheme and artifice to mislead

and defraud the public by means of false and fraudulent pretenses and representations, the

Defendants did place in an authorized depository for mail, or did deposit or cause to be deposited

with private and commercial interstate carriers and knowingly caused to be delivered by the

United States postal service, letters, memoranda, and other matters, in violation of 18 U.S.C. §

1341, or aided and abetted in such criminal acts by mailings to Plaintiffs, their family members,

business and personal associates, and others, containing false and defamatory misinformation

regarding the Plaintiffs.

65.      For the purpose of devising and carrying out their schemes and artifice to

defraud the public and to damage Plaintiffs by means of false and fraudulent pretenses,

representations and promises, the Defendants caused to be transmitted by means of wire

communication in interstate commerce, writings, signals and sounds, to wit, interstate electronic mail messages and/or facsimile in violation of 18 U.S.C. § 1343, or aided and abetted in such criminal acts, constituting predicate acts in furtherance of Defendants' Racketeering Enterprise.

**The Pattern of Racketeering Activity**

66.     The Defendants' previously alleged RICO predicate acts constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), in that the predicate acts are related and continuous. Each predicate act had the same or similar purpose, which was to make material misrepresentations, omissions and concealments of material fact as part of a scheme to defraud the public, and business and personal associates of the Plaintiffs into believing that the Plaintiffs were people of low moral character, disreputable, and untrustworthy.

67.     This pattern of racketeering was separate and distinct from the legitimate purposes of the Enterprise, such as providing trucking, investigative and other business and professional services to the public.

68.     The Defendants were each associated with the Enterprise and did conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), to wit:

a. Multiple instances of mail fraud in violation of 18 U.S.C. § 1341; and

b. Multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

69.     Plaintiffs have sufficiently alleged these predicate acts and pattern of racketeering to state a claim under 18 U.S.C. § 1962. As a proximate result of said pattern of racketeering activity and RICO violations engaged in by Defendants, Plaintiffs have suffered economic injury and damages to their business and property, as well as other economic damages.

**Continuity of The Racketeering Activity**

70.     Continuity is demonstrated by the predicate acts alleged above, along with the related predicate acts described below. The pattern of racketeering involved multiple predicate acts that have taken place over many months, thus establishing both relatedness and continuity. These predicate acts illustrate a threat of continued racketeering activity and evince that the predicate acts constitute the regular manner that the RICO Defendants and their Enterprise conduct business.

**The Related Predicate Acts**

71.     The RICO Defendants' pattern of committing predicate acts of racketeering satisfies the "continuity" requirement of civil RICO, as demonstrated both by the alleged predicate acts, along with other related predicates.

72.     As a direct result of Defendants' unlawful racketeering acts and violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property and are entitled to recover treble damages and attorneys' fees under 18 U.S.C. § 1964(c).

73.     The actions of the RICO Defendants and their Enterprise are separate and apart from the activities for which TransAm, Jacobson Holdings, API, Conflict International and the other individuals and companies who participated in the activities of the Enterprise were and are entitled to lawfully engage.

74.     Defendants' racketeering activities affected interstate commerce by, among other things, the trucking and transportation of goods, and the provision of investigative services, outside of New York State, which generated revenues and monies that were then used within New York State to carry out the unlawful scheme and campaign to defraud the public and to damage and destroy the Plaintiffs.

23

75.     Defendants' false and misleading representations to, and concealment of material Facts, from the public, and from the friends, family members and business associates of the Plaintiffs, were the proximate cause of injuries to the Plaintiffs, which continue to accrue as of the present and into the indefinite future.

76.     The damages suffered by Plaintiffs are in an amount to be established at trial, but in no event less than $20 million.

### COUNT II
### (RICO Conspiracy)

77.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

78.     As set forth in detail above, the RICO Defendants and their co-conspirators engaged in a fraudulent scheme to defraud the public, and Plaintiffs' friends, family members and business associates, into believing that Plaintiffs were of low moral character, untrustworthy, disreputable, and not people to be associated with in any business or personal capacity.

79.     At all relevant times, the RICO Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

80.      At all relevant times, Defendants and the co-conspirators each met the definition of a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

81.      At all relevant times, Defendants controlled the Racketeering Enterprise and engaged in racketeering activities for the purpose of defrauding the public and Plaintiffs' friends, family members and business associates.

82.     At all relevant times, the Racketeering Enterprise was engaged in, and its activities affected, interstate commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

83.     As set forth in Count One, Defendants controlled the Racketeering Enterprise,

and the Defendants and their co-conspirators conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c).

84.     At all relevant times, Defendants and the co-conspirators each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), *i.e.,* each agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

85.     Defendants and the other co-conspirators committed and/or caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

86.     As a result of the Defendants' and their co-conspirators' fraudulent misstatements (to which the public and others detrimentally relied), and the Defendants' other misconduct, Plaintiffs were directly and proximately injured in their business or property by the predicate acts engaged in by the Defendants and their co-conspirators.

87.     As a result of Defendants' and the other co-conspirators' violations of 18 U.S.C. § 1962(c), the Plaintiffs lost significant business and non-business opportunities.

88.     As a result of the RICO Conspiracy, Defendants and their co-conspirators are liable to the Plaintiffs for their losses in an amount to be determined at trial, but in no event less than $20 million.

89.      Pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees from the Defendants.

## COUNT III
## (Tortious Interference With Business Relations)

90.     Plaintiffs repeat and reallege each and every foregoing paragraph of this

Complaint as though fully set forth herein.

91.     Defendants' malicious campaign to damage and destroy Plaintiffs' reputations

tortiously interfered with their business relations.

92.     Plaintiffs are entitled to an award of money damages in an amount to be

determined at trial for the damages caused to their business careers.

## COUNT IV
## (Intentional Infliction Of Emotional Distress)

93.     Plaintiffs repeat and reallege each and every foregoing paragraph of this

Complaint as though fully set forth herein.

94.     Defendants' malicious campaign to stalk, harass, humiliate, damage and falsely

defame Plaintiffs constituted extreme and outrageous conduct which was intended to cause

Plaintiffs, or disregarded the substantial probability of causing, severe emotional distress.

95.     This extreme and outrageous conduct, amongst countless other instances,

included the following serial harassment and humiliation of Plaintiffs: (i) Defendant Jacobson's

funding and orchestrating of the persistent and ongoing campaign involving Conflict

International, Jason Cohen, and others, to stalk, harass, and humiliate Plaintiffs; (ii) Defendant

Jacobson's organizing, overseeing, and funding of innumerable defamatory articles, (iii)

Defendant Jacobson's persistent harassment of Plaintiffs (aided by Defendant Komorek, Cohen,

Law Enforcement Today, Reyes, and other unidentified individuals) on social media via "troll"

Instagram accounts; (iv) Defendant Jacobson's planting of numerous anonymous "reports"

online (aided by Defendant Komorek, Conflict International, Cohen, Law Enforcement Today,

Reyes, and other unidentified individuals), falsely accusing Plaintiffs of criminal activity and

unsavory behavior. That this campaign of harassment and humiliation was not only directed towards Plaintiffs, but also their current and ex-business partners, and family members, makes such conduct particularly egregious.

96.     There was a causal connection between Defendants' outrageous and reprehensible conduct and Plaintiffs' injuries, causing them to suffer severe emotional and psychological distress.

97.     Plaintiffs are entitled to an award of damages in an amount to be determined at trial, but in no event less than $20 million.

## COUNT V
### (Negligent Infliction Of Emotional Distress)

98.     Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint as though fully set forth herein.

99.     Defendants' gross negligence and disregard of the facts with regard to the conduct detailed in the foregoing paragraphs of this Complaint were directly and causally related to the severe emotional and psychological distress suffered by Plaintiffs.

100.    This conduct in question, amongst countless other instances, included the following serial harassment and humiliation of Plaintiffs: (i) Defendant Jacobson's funding and orchestrating of the Defendants' persistent and ongoing campaign to stalk, harass, and humiliate Plaintiffs (aided by Defendant Komorek and the other non-party individuals and companies that participated in, and aided and abetted, the racketeering Enterprise); (ii) Defendants' organizing, overseeing, and/or funding of innumerable defamatory articles, including those portraying Plaintiff Shapiro as a prostitute, thief, perpetrator of assault, and general criminal; (iii) Defendant Jacobson's persistent harassment of Plaintiffs (aided by her co-Defendant and their co-conspirators) on social media via "troll" Instagram accounts; (iv) Defendants' planting of

27

numerous anonymous "reports" online (aided by their co-conspirators), falsely accusing Plaintiffs of criminal activity and unsavory behavior. This campaign of harassment and humiliation was not only directed towards Plaintiffs, but also their current and ex-business partners, friends and family, making such conduct particularly egregious.

101.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial, but in no event less than $20 million.

## JURY TRIAL DEMANDED

102.    Plaintiffs demand a jury trial on all issues so triable.

**WHEREFORE**, Plaintiffs respectfully request that judgment be rendered against the Defendants as follows:

a.   Awarding Plaintiffs treble the damages suffered as a result of the wrongs complained of herein in Count I of the Complaint, together with interest;

b.   Awarding Plaintiffs treble the damages suffered as a result of the wrongs complained of herein in Count II of the Complaint, together with interest;

c.   Awarding Plaintiffs compensatory and punitive damages on Counts III through V in amounts to be determined at trial;

d.    Awarding Plaintiffs their cost and expenses of this litigation, including reasonable attorneys' fees, expert fees and other costs and disbursements;

e.   Awarding prejudgment interest, post judgment interest, and costs; and

f.   Awarding Plaintiffs such other and further relief as may be just and proper.

Dated: New York, New York
          May 12, 2023                                    McCALLION & ASSOCIATES LLP

                                                          */s/ Kenneth F. McCallion*

                                                          _____
                                                          By: Kenneth F. McCallion
                                                          Attorneys for Plaintiffs
                                                          100 Park Avenue – 16th floor
                                                          New York, New York 10017
                                                          (646) 366-0884

**VERIFICATION**

TREVOR SHAPIRO, hereby affirms and verifies as follows:

      1.      I am the Plaintiff in this action, and am fully familiar with the facts and circumstances of this case.

      2.      I have read the contents of the foregoing Complaint and find the allegations contained therein to be true and correct, except as to those matters asserted upon information and belief, and as to those matters, I believe them to be true and correct.

Dated: New York, New York

      May 12, 2023

**TREVOR SHAPIRO**

**VERIFICATION**

JOHANNA QVIST, hereby affirms and verifies as follows:

     1.      I am the Plaintiff in this action, and am fully familiar with the facts and circumstances of this case.

     2.      I have read the contents of the foregoing Complaint and find the allegations contained therein to be true and correct, except as to those matters asserted upon information and belief, and as to those matters, I believe them to be true and correct.

Dated: New York, New York
     May 12, 2023

                                                     JOHANNA QVIST