```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
TREVOR SHAPIRO, et al.,                                      :
                                  Plaintiffs,                :
              -against-                                      :   23 Civ. 3964 (LGS)
                                                             :
TRUDY JACOBSON, et al.,                                      :   OPINION & ORDER
                                  Defendants.                :
-------------------------------------------------------------X
```

LORNA G. SCHOFIELD, United States District Judge:

Plaintiffs Trevor Shapiro and Johanna Qvist bring this action against Defendants Trudy Jacobson and Stephen Komorek alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and New York state tort law. Defendants move to dismiss all claims in the First Amended Complaint ("FAC"). For the following reasons, the motion is granted, except for the claims for tortious interference with business relations.

I. **BACKGROUND**

The following facts are taken from the FAC. *See Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021). These facts are assumed to be true for purposes of this motion and are construed in the light most favorable to Plaintiffs as the non-moving party. *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022).

Plaintiff Trevor Shapiro is a model and businessman. From approximately 2018 to December 2020, Shapiro and Defendant Trudy Jacobson engaged in a romantic relationship. The FAC alleges that after the relationship ended, Jacobson entered into "a campaign to harass, damage and defame" Shapiro.

The FAC alleges that as part of that campaign, Jacobson paid $1.8 million to an investigative agency called Conflict International to conduct certain private investigations of

Shapiro and his friends. At the time, Defendant Stephen Komorek was the senior vice president of Conflict International.

In March 2021, Komorek hired a private investigator, who went to Shapiro's apartment and gave Shapiro a folder containing Shapiro's personal information and photographs of a man -- misidentified as Shapiro -- with women. The investigator stated, "This is for you from the people in Italy," allegedly referencing the Italian Mafia. "Literally moments" after the private investigator left, Shapiro received a text from Jacobson stating that a man gave her a folder at her apartment too.

Approximately two weeks later, when Shapiro was having dinner with friends, Shapiro received a text from Jacobson intended for an investigator, which stated, "[Shapiro's] guy friend the one I sent photos of, is at a restaurant." Two unidentified men later visited Shapiro's female friend, handed her a folder of photos of her and Shapiro and stated, "[T]his is from the people in Italy." In May 2021, two unidentified men took photos of Shapiro at a bowling alley with friends. When Shapiro approached the men, they denied taking photos of him and "quickly left."

In June 2021, Shapiro and a friend, Cheyenne Lutek, created an online business called "Him-Eros," "for women to hire men as escorts and companions at social and charity events." An unidentified woman repeatedly asked on the website and over the phone if "any other guys [were] working on the site as a companion." Lutek determined that the woman was Jacobson. When Lutek asked the caller if she was Jacobson, the caller "abruptly hung up."

In June and July 2021, Shapiro learned that several online articles falsely portrayed him as a "male prostitute." At least one article -- published on June 19, 2021, on a website called Law Enforcement Today ("LET") -- accused Him-Eros of being a "cover for a male prostitution operation or something at least incredibly similar." "Shortly after the publication of this article

2

in LET," Jacobson "bragged in text messages" to a third party that she paid for the June 19, 2021, article and other defamatory articles. The FAC alleges that these articles were designed to defame Shapiro and cause Him-Eros to shut down. Him-Eros shut down following the publication of the June 19, 2021, article "due to the bad publicity." In addition, shortly after Shapiro signed with a modeling agency in May 2021, the agency declined to book him for photoshoots due to the false articles, including one that specifically referenced his relationship with the agency.

On July 27, 2021, Defendants and/or their agents generated, and Jacobson paid for, an article accusing Shapiro of becoming violent while drunk and on drugs at a modeling photoshoot. The article also accused Shapiro of stealing a watch and Chanel sunglasses -- the same items that Jacobson had given Shapiro on his birthday the prior year. However, Shapiro had not been hired for the photoshoot, the studio at which the alleged conduct occurred did not exist and the photographer's name was a pseudonym for Jacobson and/or her agents. Other defamatory articles appeared online targeting Lutek and Plaintiff Johanna Qvist, who is Shapiro's girlfriend.

In July 2021, an unidentified man followed Shapiro and Qvist from Brooklyn to Manhattan. The same man followed Shapiro on two other occasions in 2021. On the second occasion, Shapiro approached the man and mentioned Jacobson, and the man "immediately broke off the conversation and" left. In August 2021, an unidentified man repeatedly videotaped Shapiro in public.

"[I]nnumerable 'troll' Instagram accounts" appeared humiliating and harassing Plaintiffs, including one account containing a photo of a rat that also appeared on Jacobson's personal Instagram page. Another Instagram account linked to an LET article about Lutek, paid for by

Jacobson. Lutek's and Shapiro's family members also received packages containing "derogatory and defamatory materials."

On November 17, 2021, six-foot tall banners appeared outside Qvist's apartment containing photos of Shapiro and Lutek, the statement "REPORT HUMAN TRAFFICKING" and a phone number for a human trafficking hotline. In December 2021, the same posters appeared throughout Qvist's neighborhood. After Qvist took down the posters, new ones were posted the following day. In January 2022, the same posters appeared outside Shapiro's apartment.

On October 29, 2021, LET published an article referencing Shapiro's alleged conduct at the photoshoot, calling Lutek "basically the equivalent of a porn actress," calling Shapiro "the equivalent of a gigolo" and stating that both were "under investigation for sex trafficking and drugs." On March 11, 2022, Defendants caused an article to be published online accusing Qvist of being a "pornstar" with a fake nursing career. On May 2, 2022, Jacobson paid for, and "Defendants caused," an article to be published on LET repeating allegations of Shapiro's photoshoot conduct and falsely stating that Him-Eros was a "prostitution site" and that surveillance footage existed of Shapiro with women at hotels. On June 10, 2022, LET republished the June 19, 2021, and October 29, 2021, articles.

The FAC alleges that Shapiro's career was damaged after fashion designers and others saw the articles or received false information about Shapiro from Defendants. In February 2020, Jacobson contacted the owners of a business at which Shapiro worked to tell them that Shapiro was working at an "underground sex club." Shapiro was terminated because of Jacobson's communication. On May 13, 2022, Jacobson told a fashion designer that Shapiro was having an illicit affair with an individual who ran a modeling agency and that Shapiro and the individual

4

were harassing Jacobson.  On July 29, 2022, the designer received a text from an unknown phone number -- alleged to be Jacobson or an associate she directed -- linking to a defamatory article about Shapiro.  The designer told Shapiro, "[I]t is embarrassing bc I am trying to get you a campaign and people are seeing this . . . but my clients can see this [article]."  The designer then "stopp[ed] working with Shapiro altogether."  Shapiro suffered "such severe psychological and emotional distress as a result of Defendants' actions that he required the assistance of a psychotherapist."

On September 6, 2022, Jacobson contacted Qvist's workplace and stated that there were "naked pictures of your employee online"; human resources contacted Qvist as part of an investigation into the matter.  Qvist also lost a work opportunity with Mount Sinai hospital because Jacobson contacted the hospital on September 6, 2022, and provided false information about Qvist.  On November 18, 2022, Jacobson, or someone hired by her, impersonated Qvist and called Qvist's bank asking for information about her bank accounts; the woman had Qvist's passcode, social security number and other confidential information needed to access the account information.  Qvist suffered severe emotional and psychological trauma from Defendants' actions.

The allegations in the FAC primarily took place between March 2021 and November 2022, except for the allegation that Jacobson contacted the owners of a business at which Shapiro worked to tell them that Shapiro was working at an "underground sex club," which took place in February 2020 and predated Shapiro and Jacobson's break-up in December 2020.  The FAC does not allege any activities between November 2022 and the filing of the FAC on December 17, 2023.

## II.  STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider conclusory allegations or legal conclusions couched as factual allegations. *See Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[1] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020). It is not enough for a complaint to allege facts that are consistent with liability; it must "nudge[ ]" claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Est. of Umar*, 2 F.4th 70, 80 (2d Cir. 2021). To survive dismissal, "plaintiffs must provide the grounds upon which their claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019).

## III.  DISCUSSION

### A.  Civil RICO

The FAC asserts both substantive and conspiracy claims under RICO. Both RICO claims are dismissed as insufficiently pleaded.

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

1.      **Substantive RICO (Count I)**

The FAC fails to state a substantive civil RICO claim. To plead a substantive civil RICO violation, a complaint must allege that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013); *accord Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018).

The FAC fails to allege a pattern of racketeering activity. "Racketeering activity" for purposes of RICO includes any act indictable under various specified federal statutes, including the wire fraud statute. 18 U.S.C. § 1961(1); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018). A pattern of racketeering activity requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5). Those predicate acts must be "related" and must "amount to or pose a threat of continued criminal activity." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014). "The requisite continuity may be found in either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *Id.* "Given the routine use of . . . wire communications in business operations, . . . RICO claims premised on . . . wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* at 489; *accord One World, LLC v. Onoufriadis*, No. 21-374-CV, 2021 WL 4452070, at *2 (2d Cir. Sept. 29, 2021).

i.      **Open-Ended Continuity**

The FAC fails to allege an open-ended pattern of racketeering activity. Open-ended continuity requires "that there was a threat of continuing criminal activity beyond the period

during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008); *accord Highmore Fin. Co. I, LLC v. Greig Cos., Inc.*, No. 21 Civ. 11021, 2023 WL 4865722, at *5 (S.D.N.Y. July 31, 2023). "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful . . . . When the enterprise primarily conducts a legitimate business, however, no presumption of a continued threat arises. In such cases, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued activity." *Spool*, 520 F.3d at 185; *accord One World, LLC*, 2021 WL 4452070, at *3.

The FAC does not allege that the alleged enterprise's business is primarily or inherently unlawful; instead, it alleges that the members of the alleged enterprise "not only used the Enterprise to commit . . . the [illegal] predicate acts alleged, but also used the Enterprise to conduct private investigations of Plaintiffs and their associates," which they "were and are entitled to lawfully engage." Therefore, no presumption of a continued threat arises. Plaintiffs argue that a continued threat exists based on "the proliferation of Defendants' misconduct over the period of February 2020 to November 2022, and its incessant nature during this timeframe." However, the FAC fails to allege an "incessant nature" of predicate acts that could imply a threat of continued activity. The FAC lacks allegations of misconduct between February 2020 and March 2021 -- a span of over a year -- and between November 2022 and the filing of the FAC in December 2023 -- another span of over a year. Plaintiffs argue that allegations cease after November 2022 because Shapiro filed suit against LET on September 24, 2022, and against Defendants here on May 12, 2023, but the lawsuit against LET predates the cessation of activity

8

by two months and does not explain the cessation between February 2020 and March 2021. The predicate acts alleged in the FAC do not imply a threat of continued activity.

### ii. Closed-Ended Continuity

The FAC fails to allege closed-ended continuity. Closed-ended continuity requires "a series of related predicates extending over a substantial period of time." *Spool*, 520 F.3d at 184; *accord MinedMap, Inc. v. Northway Mining, LLC*, No. 21-1480-CV, 2022 WL 570082, at *1 (2d Cir. Feb. 25, 2022). When analyzing a closed-ended continuity, courts consider "factors such as the number and variety of predicate acts," the "absence of separate schemes" and the "numbers of participants and victims." *Spool*, 520 F.3d at 184; *accord MinedMap, Inc.*, 2022 WL 570082, at *2. The inquiry is also "primarily a temporal concept." *Spool*, 520 F.3d at 184; *accord One World, LLC*, 2021 WL 4452070, at *2. "[T]wo years may be the minimum duration necessary to find closed-ended continuity," but "the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004); *accord MinedMap, Inc.*, 2022 WL 570082, at *1.

All but one of the predicate acts alleged in the FAC took place between March 2021 and November 2022. The exception, which occurred in February 2020, is fairly viewed as separate because it occurred ten months before Shapiro and Jacobson broke off their romantic relationship. The later predicate acts followed the break-up in December 2020, are described as part of Jacobson's "campaign to harass, damage and defame her former lover," and spanned only twenty-one months.

Even including the February 2020 conduct, which brings the period of misconduct to slightly more than two years, does not suffice to allege a closed-ended pattern of activity. The

9

FAC identifies at most three victims -- Shapiro, Qvist and Lutek.  The purported scheme operated with a narrow goal -- to defraud those three victims of "money and property," primarily employment and business opportunities.  This narrow and relatively short-lived scheme "can hardly be considered a large-scale fraud as generally seen in RICO cases." *MinedMap, Inc.*, 2022 WL 570082, at *2 (no closed-ended continuity for  wire and mail fraud predicate acts "more akin to garden variety breach of contract and tort claims" forming single scheme); *accord JGIAP RH 160 LLC v. CRI Holding Corp*., No. 21 Civ. 02489, 2023 WL 5979125, at *10 (E.D.N.Y. Aug. 16, 2023), *report and recommendation adopted*, No. 21 Civ. 02489, 2023 WL 6307320 (E.D.N.Y. Sept. 28, 2023) ("[C]ourts in the Second Circuit have held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, there will be no closed-ended or open-ended pattern" of racketeering activity.).

### 2. RICO Conspiracy (Count II)

The FAC also fails to state a RICO conspiracy claim.  Section 1962(d) makes it "unlawful for any person to conspire to violate [the RICO statute]."  18 U.S.C. § 1962(d).  To state a claim for a RICO conspiracy, a plaintiff must allege "the existence of an agreement to violate RICO's substantive provisions."  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018); *accord Lateral Recovery LLC v. Queen Funding, LLC*, No. 21 Civ. 9607, 2022 WL 2829913, at *2 (S.D.N.Y. July 20, 2022).  If a complaint fails to state a substantive RICO claim, it also does not state a claim for RICO conspiracy.  *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998); *accord Nygård v. Bacon*, No. 19 Civ. 1559, 2021 WL 3721347 at *3 (S.D.N.Y. Aug. 20, 2021).  Because the FAC fails to state a substantive RICO claim, it also does not state a claim for RICO conspiracy.

10

### B.  Tortious Interference with Business Relations (Count III)

Defendants challenge the claims of tortious interference with business relations on the ground that they are untimely. Defendants also assert for the first time in their reply that Qvist's claim is insufficiently pleaded. As discussed below, these arguments are unavailing. The claims for tortious interference with business relations survive Defendants' motion to dismiss.

#### 1.  Statute of Limitations

The statute of limitations "is an affirmative defense for which the defendant bears the burden of proof." *Browe v. CTC Corp.*, 15 F.4th 175, 190 (2d Cir. 2021). Dismissal is appropriate only if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015); *accord Teva Pharms. USA, Inc. v. Perrigo, LLC*, No. 23 Civ. 1825, 2024 WL 402923, at *3 (S.D.N.Y. Feb. 2, 2024). Under New York law, the statute of limitations for a tortious interference with business relations is three years. CPRL § 214(4); *Linkable Networks, Inc. v. Mastercard Inc.*, 125 N.Y.S.3d 92, 93 (1st Dep't 2020). "[W]here a complaint does not rely *merely* on *generalized* reputational harm, and instead relies on economic injury, the claim sounds in tortious interference" and the three-year statute of limitations applies, not the one-year limit for defamation. *See Glob. Supplies NY, Inc. v. Electrolux Home Prod., Inc.*, No. 21-674, 2022 WL 815795, at *2 (2d Cir. Mar. 18, 2022) (summary order) (citing *Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 495 (1st Dep't 2009)). "For instance, an allegation that a specific business relationship . . . has been harmed suggests that the claim is substantively for tortious interference. On the other hand, an allegation of harm to professional reputation that had an indirect effect on the ability to form business relationships suggests that a claim sounds in defamation." *Id.*

11

The three-year statute of limitations applies because the FAC alleges harm to specific business relationships. The FAC alleges that as a direct result of actions taken by Jacobson, Him-Eros shut down in 2021, a modeling agency with which Shapiro worked did not book him for further shoots after an article appeared targeting Shapiro's relationship with the agency in 2021, and a designer decided to stop working with Shapiro after receiving a text with a link to a "defamatory article[]" in 2022. As to Qvist, the FAC alleges that on September 6, 2022, Jacobson told Qvist's employer that there were "naked pictures of your employee online" and that Qvist's employer asked Qvist about the call. The FAC also alleges that Qvist lost a potential work opportunity with Mount Sinai hospital because Jacobson contacted the hospital and provided false information about Qvist on September 6, 2022.

The limitations period begins to run on "the date of injury, which is triggered when a plaintiff first sustains damages." *Linkable Networks, Inc.*, 125 N.Y.S.3d at 93. The Complaint was filed on May 12, 2023. The alleged interference with Shapiro's Him-Eros website, Shapiro's modeling shoots, Qvist's employer and Qvist's potential work opportunity all allegedly took place in 2021 or 2022, and therefore fall within the three-year period. To the extent that the FAC also includes as part of Shapiro's claim for tortious interference the allegation that, in February 2020, Jacobson contacted the owners of a business at which Shapiro worked to tell them that Shapiro was working at an "underground sex club," that allegation does not give rise to a timely claim because it falls outside the three-year limitations period.

2. **Sufficiency of Pleading Qvist's Claim**

In their reply, Defendants argue that the FAC cannot support a cognizable claim for Qvist, even if the three-year statute of limitations applies. A court ordinarily will not consider issues raised for the first time in a reply brief. *See Schwab Short-Term Bond Mkt. Fund v. Lloyds*

*Banking Grp. PLC*, 22 F.4th 103, 123 n.8 (2d Cir. 2021).  Consideration of a new argument generally is inappropriate if the opposing party has had no opportunity to respond.  *See Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago ex rel. Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*, 693 F. App'x 77, 78 (2d Cir. 2017) (summary order).  Qvist has not had an opportunity to reply to Defendants' new argument.  The argument therefore is not considered here.

### C.    Intentional Infliction of Emotional Distress (Count IV)

The intentional infliction of emotional distress ("IIED") claim is untimely under New York law.  An IIED claim must be brought within one year of the asserted injury.  C.P.L.R. § 215(3); *see Trayvilla v. Japan Airlines*, 111 N.Y.S.3d 224, 225 (2nd Dep't 2019).  The limitations period "begins to run on the date of injury."  *Bellissimo v. Mitchell*, 995 N.Y.S.2d 603, 605 (2d Dep't 2014).  The injury here predates the one-year cutoff.

Plaintiffs unsuccessfully argue that the IIED claim is timely based on the continuing tort doctrine, which "permits claims based on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit."  *Estreicher v. Oner*, 49 N.Y.S.3d 530, 532 (2d Dep't 2017); *see Barone v. United States*, No. 12 Civ. 4103, 2016 WL 2658174, at *2 (S.D.N.Y. May 5, 2016), *aff'd*, 722 F. App'x 57 (2d Cir. 2018) (summary order) (collecting cases applying the continuing tort doctrine to IIED claims).  New York courts treat "the final actionable event" as the last tortious act by the tortfeasor, not the last injury sustained by the victim.  *See Mintz & Gold, LLP v. Zimmerman*, 898 N.Y.S.2d 116, 117 (1st Dep't 2010); *accord Abdulaziz v. McKinsey & Co., Inc.*, No. 21 Civ. 1219, 2021 WL 4340405, at *3 (S.D.N.Y. Sept. 22, 2021), *aff'd* No. 21-2921, 2022 WL 2444925 (2d Cir. July 5, 2022).  Despite Plaintiffs' argument to the contrary, courts in this Circuit

13

continue to require that the timely conduct be independently actionable even after the Second Circuit's decision in *Rentas v. Ruffin*, 816 F.3d 214 (2d Cir. 2016), which was silent on the issue. *See, e.g.*, *Truman v. Brown*, 434 F. Supp. 3d 100, 118-21 (S.D.N.Y. 2020) (finding that conduct within the limitations period was insufficiently extreme and outrageous to be independently actionable).

The conduct alleged to have taken place within the statute of limitations is not independently actionable. Under New York Law, IIED requires "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019) (New York law). IIED "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Id.*

The first prong requires that the conduct "be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Specht v. City of New York*, 15 F.4th 594, 606 (2d Cir. 2021) (citing *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983), *superseded by statute on other grounds*). However, "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation, IIED provides a remedy. In other words, under New York law, the proper inquiry is not merely whether each individual act might be outrageous. Rather, the question is whether those actions -- under the totality of the circumstances -- amounted to a deliberate and malicious campaign." *Rich*, 939 F.3d at 123 (citing *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (1st Dep't 2018)). "Those few claims of intentional infliction of emotional distress that have been upheld" by the New York Appellate

Division "were supported by allegations detailing a longstanding campaign of deliberate, systematic and malicious harassment of the plaintiff." *Seltzer v. Bayer*, 709 N.Y.S.2d 21, 23 (1st Dep't 2000); *accord Smith v. Davis*, No. 5:22 Civ. 1202, 2023 WL 5019432, at *10 (N.D.N.Y. Mar. 28, 2023), *report and recommendation adopted*, No. 5:22 Civ. 1202, 2023 WL 4346961 (N.D.N.Y. July 5, 2023).

Even taken together, the facts within the limitations period do not allege a campaign sufficient to support Shapiro's IIED claim. The timely facts are as follows: On May 13, 2022, Jacobson told a fashion designer that Shapiro was having an illicit affair with an individual who ran a modeling agency and that Shapiro and the individual were harassing Jacobson. On July 29, 2022, the designer received a text from an unknown phone number -- alleged to be Jacobson or an associate she directed -- linking to a defamatory article about Shapiro. The designer told Shapiro, "[I]t is embarrassing bc I am trying to get you a campaign and people are seeing this . . . but my clients can see this [article]." The designer then stopped working with Shapiro. Jacobson's two outreaches to a business contact -- even if "defamatory," "humiliating, insulting and intended to intimidate" and causing negative consequences -- fall short of alleging "a deliberate and malicious campaign" sufficient to support an IIED claim. *See, e.g.*, *Blanco v. Success Acad. Charter Sch., Inc.*, No. 23 Civ. 01652, 2024 WL 965001, at *16 (S.D.N.Y. Mar. 6, 2024) (defamatory conduct which was "humiliating, insulting and intended to intimidate" and in part caused student to withdraw from school did "not amount to a deliberate and malicious campaign of harassment and intimidation").

The FAC's allegation that LET republished allegedly defamatory articles on June 10, 2022, cannot contribute to the alleged campaign here because the FAC lacks any facts tying Defendants to the republication, as detailed in Section III.E below. Statements by third parties

15

"cannot be used as evidence of plaintiffs' claims of intentional infliction of emotional distress against" a defendant. *McCollum v. Baldwin*, 688 F. Supp. 3d 117, 133 (S.D.N.Y. 2023).

With regard to Qvist, the outcome is the same. The facts alleged within the limitations period are: Jacobson contacted Qvist's workplace on September 6, 2022, saying that there were naked pictures of Qvist online, and a human resources representative followed up with Qvist about the allegations; Jacobson contacted a prospective employer of Plaintiff Qvist, causing her to be declined a work application on September 6, 2022; and Jacobson or her associate contacted Qvist's bank on November 18, 2022, impersonating Qvist with the purpose of obtaining confidential information about Qvist's bank account. Narrowed to these few timely occurrences alone, the FAC does not allege a longstanding campaign of harassment against Qvist.

Plaintiffs' reliance on *McCollum*, 688 F. Supp. 3d 117, and *Moraes v. White*, 571 F. Supp. 3d 77 (S.D.N.Y. 2021), is misplaced. *McCollum* determined that the alleged conduct was not extreme or outrageous, 688 F. Supp. 3d at 133, and *Moraes* relied on the defendant's knowledge of the plaintiff's susceptibility to emotional distress, which transforms "non-actionable acts . . . into outrageous conduct," 571 F. Supp. 3d at 105.

### D.   Negligent Infliction of Emotional Distress (Count V)

The FAC fails to plead a claim for negligent infliction of emotional distress ("NIED"). Under New York law, NIED requires "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (New York law).

The FAC alleges only intentional conduct, which cannot form the basis for a claim grounded in negligence, including NIED. *See Fernandez v. Fernandez*, 189 N.Y.S.3d 538, 541

(2d Dep't 2023) ("[A]llegations of intentional conduct . . . cannot form the basis of a negligence claim."); *Gruber v. Donaldsons, Inc.*, 162 N.Y.S.3d 393, 397 (2d Dep't 2022) (affirming dismissal of NIED claim where "the cause of action was premised only on allegations of intentional conduct"); *Mees v. Stibbe New York B.V.*, 146 N.Y.S.3d 481, 481-82 (1st Dep't 2021) (finding "palpably insufficient" NIED and negligence claims "supported solely by allegations of intentional conduct").

### E. Defamation (Count VI)

The defamation claim is untimely under New York law. The statute of limitations for defamation is one year. CPLR § 215(3). The limitations period runs from the date of publication. *See Gregoire v. Putnam's Sons*, 81 N.E.2d 45, 47 (N.Y. 1948); *accord Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 276-77 (S.D.N.Y. 2016) (New York law). The FAC alleges that Defendants "financed, authored and promoted" allegedly defamatory articles published on the LET website on June 19, 2021, and on October 29, 2021, among others. Plaintiffs do not dispute that defamation claims based on the 2021 publication of these articles are untimely.

Plaintiffs argue that the republication of the two articles in 2022 within the limitations period gives rise to a timely defamation claim. The June 10, 2022, republication does not save the defamation claim. If a defamatory statement is "republished" in a new format, the statute of limitations begins to run anew from the date of republication. *See Firth v. State of New York*, 775 N.E.2d 463, 466 (N.Y. 2002). Republication requires "a separate aggregate publication from the original, on a different occasion, which is not merely a delayed circulation of the original edition." *Id.*; *accord Stringer v. Kim*, 211 N.Y.S.3d 20, 21 (1st Dep't 2024). "Retriggering [the statute of limitations] by republication also requires that the original publisher

17

of the statement participate in or approve of the decision to republish the allegedly defamatory statement." *Stringer*, 211 N.Y.S.3d at 21 (citing *Geraci v. Probst*, 938 N.E.2d 917, 921-22 (N.Y. 2010)). The FAC lacks any facts alleging that Defendants participated in or approved of the decision to republish the articles. The FAC does not allege that Defendants contacted LET for republication, had any control over republication, financed republication or were otherwise involved in or tied to republication in any way. Plaintiffs' argument that the articles were republished by the original publisher because LET was both the original publisher and the republisher may support a timely claim against LET, but cannot support a timely claim against Defendants.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** in part and **DENIED** in part. For clarity, the only surviving claim is Count III, tortious interference with business relations, and includes conduct that occurred only on or after May 12, 2020.

By August 20, 2024, the parties shall meet and confer and file a letter proposing next steps in the litigation, and if discovery is contemplated, a proposed Case Management Plan per the Court's individual rules. The Clerk of Court is respectfully directed to close the motion at Dkt. No. 57.

Dated: August 5, 2024
       New York, New York

                                          _____
                                          **LORNA G. SCHOFIELD**
                                          **UNITED STATES DISTRICT JUDGE**